# IN THE UNITED STATES DISTRICT COURT FOR THE
# EASTERN DISTRICT OF VIRGINIA

### Alexandria Division

John Livesay,
    Plaintiff,

v.                        1:17cv25 (LMB/JFA)

Gladys Walden, et al.,
    Defendants.

## MEMORANDUM OPINION

John Livesay, a Virginia inmate proceeding pro se, has filed a civil rights action, pursuant to 42 U.S.C. § 1983, alleging that his Eighth Amendment rights were violated by employees at Greensville Correctional Center. Specifically, plaintiff asserts claims of deliberate indifference to his serious medical needs.[1]

Plaintiff names two groups of defendants: Sergeant Gladys Walden, Warden Eddie L. Pearson, Warden C. M. Parker, Warden Louise Goode, Unit Manager Stephanie Robertson, Counselor C. Sykes, Ombudsman K. Whitehead, Ombudsman S. Tapp, Ombudsman K. Phillips, Dr. Mark Amonette, Health Services Director Frederick Schilling, Regional Administrator Gregory Holloway (collectively the "Correctional Defendants"), and Dr. David Spruill, Dr. Vincent Gore, Nurse Elizabeth Shaw, and Nurse A. Smith (collectively the "Medical Defendants").[2]

---

[1] Although plaintiff references the Fourteenth Amendment in his Amended Complaint, it appears he does so only to invoke his rights under the "Eighth Amendment as made applicable to the States by the Fourteenth Amendment." Whitley v. Albers, 475 U.S. 312, 317 (1986).

[2] Defendant Armor Correctional Health Services, Inc. was dismissed by an Order dated July 20, 2017. Dkt. No. 30.

The Correctional Defendants have filed a Motion to Dismiss plaintiff's Amended Complaint, and, after being granted an extension of time to respond, plaintiff filed his opposition to the Correctional Defendants' Motion to Dismiss. Dkt. Nos. 36-38, 52.

Dr. Spruill filed a Motion to Dismiss plaintiff's Amended Complaint to which, after being granted an extension of time to respond, plaintiff filed an opposition. Dkt. Nos. 41-42, 51. The remaining medical defendants Gore, Shaw, and Smith filed a Motion for Summary Judgment to which plaintiff has filed an opposition. Dkt. Nos. 55-57, 61. Defendants Gore, Shaw, and Smith also filed a reply and plaintiff, with leave of court, has filed a surreply. Dkt. Nos. 63, 66.[3]

Finally, plaintiff has filed motions for discovery, to defer or deny defendant's motion for summary judgment, and for appointment of counsel, and the defendants have filed motions to stay discovery. Dkt. Nos. 69-71, 76, 78.

All these motions are ripe for adjudication. For the reasons that follow, the Correctional Defendants' Motion to Dismiss will be granted and the Medical Defendants' Motion for Summary Judgment[4] will be granted, which decisions will moot all the remaining pending motions.

---

[3] To the extent plaintiff raises claims of retaliation or violations of the Equal Protection Clause in his oppositions, these claims will not be considered as they were not raised in the amended complaint. Katz v. Odin, Feldman & Pittleman, P.C., 332 F. Supp. 2d 909, 921 n.13 (E.D. Va. 2004) ("[I]t is axiomatic that a complaint may not be amended by the briefs in opposition to a motion to dismiss.") (alteration in original) (internal quotation marks and citations omitted).

[4] Dr. Spruill's Motion to Dismiss will be treated as a Motion for Summary Judgment because the allegations against all the Medical Defendants are based on plaintiff's medical care, and the records of that care have been submitted. Moreover, plaintiff has been "given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d); see also Craddock v. Rhodes, 833 F.2d 1004 (4th Cir. 1987) (table decision) ("Under this set of circumstances, we would ordinarily vacate the judgment of the district court and remand the case for further proceedings. But, here, the plaintiff has filed sufficient papers in connection with the case for us to dispose of the same.").

## I. Correctional Defendants' Motion to Dismiss

### A. Background

Plaintiff asserts that the Correctional Defendants were deliberately indifferent to his medical needs by (1) failing to provide him his missing items, specifically, a sleep mask and knee wraps, which he alleges are needed to address his photophobia and weak knees; (2) creating and following a policy of delaying medical treatment for inmates, in violation of VDOC operating policies; (3) delaying the processing of grievances; and (4) failing to train staff properly regarding the scheduling of medical appointments and the disbursement of medically approved property. In support of these claims, plaintiff asserts the following allegations in his Amended Complaint, which for purposes of the Motion to Dismiss are taken as true.[5]

#### 1. Failure to Provide Plaintiff his Missing Items

Plaintiff is currently incarcerated at Greensville Correctional Center ("GRCC"). Amend. Compl. at ¶ 4. The Amended Complaint alleges that when plaintiff, who was 52 years old when this civil action was filed, was previously held at Powhatan Correctional Center, he was classified by the Virginia Department of Corrections' ("VDOC") Americans with Disabilities Act ("ADA") Coordinator as being orthopedically and visually impaired, and was issued a sleep mask (for photosensitivity) and knee wraps (for knee support); however, when he was transferred to GRCC on October 27, 2014, these items were not re-issued to him. Id. at ¶¶ 28-30.

On October 30, 2014, plaintiff spoke with defendant Unit Manager Robertson, regarding his missing property. Id. at ¶ 30. On November 3, 2014, defendant Unit Manager Robertson told plaintiff to send property control a request form about the missing items. Id. at ¶ 31.

---

[5] Plaintiff references the exhibits to his original Complaint in his Amended Complaint, therefore, they are considered part of the Amended Complaint. In addition, the many allegations in plaintiff's Amended Complaint that are unrelated to the claims against the named defendants are not included in this Memorandum Opinion.

The Amended Complaint further alleges that on November 4, 2014, Dr. Chan authorized plaintiff to obtain knee wraps and a sleep mask from the property department, id. at ¶ 32, but that on November 13, 2014, when defendant Sergeant Walden was distributing personal property, she refused to give plaintiff these missing items even though plaintiff had authorization from the GRCC medical department, id. at ¶ 35. Plaintiff informed Sergeant Walden that "failure to issue the medical devices would result in [plaintiff's] leg giving out and [plaintiff's] suffering further injury." Id. In response, Sergeant Walden gave plaintiff a confiscation form, which plaintiff filled out that day. Id.

On December 5, 2014, plaintiff informed Ombudsman Tapp that denial of his missing items would result in plaintiff being injured. Id. at ¶ 40. On December 26, 2014, while exercising, plaintiff's right knee buckled, resulting in a painful back injury. Id. at ¶ 48. On December 27, 2014, plaintiff filed an informal grievance stating that he injured his back because defendant Walden refused to give him his knee wraps. Id. Ex. 11, at 1. Walden responded that she was not withholding plaintiff's knee wraps and that he had been given his ace bandage. Id.

The Amended Complaint further alleges that on February 3, 2015, the ADA Coordinator stated that Warden Pearson was aware of the fact that plaintiff's items were being withheld. Id. at ¶ 67. On February 13, 2015, plaintiff wrote to defendant Warden Pearson regarding his missing items. Id. at ¶ 73.

On March 19, 2015, plaintiff submitted a Personal Property Request Form asking to purchase a sleep mask, which was denied on April 10, 2015, on the ground that "medical needs to provide sleep mask [sic]." Id. at ¶ 78.

On April 10, 2015, Nurse Tarpley directed that plaintiff's sleep mask and knee wraps be released from the property department. Id. at ¶ 84. Plaintiff provided this information to

defendant Unit Manager Robertson who told plaintiff to see Counselor Bailey. Id. On April 16, 2015, Counselor Bailey informed plaintiff that "medical must approve and give [the sleep mask] to you." Id. Ex. 22.

On May 26, 2015, Dr. Sharma ordered a new sleep mask for plaintiff, but the order was discontinued by defendants Dr. Gore and Nurse Shaw. Id. at ¶¶ 91, 99. On August 27, 2015, Nurse Flowers ordered a sleep mask for plaintiff. Id. at ¶ 101.

On October 14, 2015, plaintiff was told that his request for a sleep mask had been denied again by Dr. Gore, and plaintiff was informed that Dr. Gore found no medical indication that plaintiff needed a sleep mask. Id. at ¶ 103. Plaintiff's grievance of this decision was determined to be unfounded at every level of review. Id. Ex. 28. On December 15, 2015, Ombudsman Tapp refused to help plaintiff regarding the missing sleep mask and knee wraps. Id. at ¶ 109.

On November 11 and 17, 2016, plaintiff sent defendant Dr. Amonette letters regarding his sleeping problems. Id. at ¶¶ 159, 164. On November 14, 2016, plaintiff filed an offender request form asking Warden Pearson to overrule Dr. Gore's decision regarding the sleep mask, and on December 16, 2016, plaintiff wrote Warden Pearson a letter regarding his missing items. Id. at ¶¶ 162, 177.

On December 1, 2016, Dr. Spruill told plaintiff that he would not order plaintiff a sleep mask or approve plaintiff for a sleep mask. Id. at ¶ 168.

### 2. Creating and Following a Policy of Delaying Medical Treatment

Plaintiff alleges that the Correctional Defendants maintained a policy of delaying medical treatment for up to several weeks at a time and denying medically necessary property for inmates, in part by not following the VDOC policy requiring that inmates be seen by a medical professional within 72 hours of submitting a medical request. Id. at ¶¶ 207-08, 211, 225.

Plaintiff further alleges that the Correctional Defendants were aware that delaying plaintiff's medical treatments and denying him his missing items would cause him injury; however, because of the Correctional Defendants' policies, plaintiff suffered "severe, debilitating, physical pain and discomfort, and needless uncertainty giving rise to extreme mental anguish and emotional distress." Id. at ¶¶ 206, 209, 215.

Plaintiff includes Wardens Pearson, Parker, and Goode in this litigation because they have final policy making authority at GRCC, and Sergeant Walden and Counselor Sykes because they have final policy making authority regarding the distribution of property. Id. at ¶¶ 216-17.

### 3. Delaying the Processing of Grievances and Denial of Grievances

Plaintiff was transferred from Powhatan to GRCC on October 27, 2014 and his numerous grievances throughout his incarceration at GRCC are included in the record and show that starting November 14, 2014, plaintiff began filing multiple grievances against various defendants addressing their failure to provide the sleep mask and knee wrap, as well as delays in getting medical appointments and medication. Id. at ¶ 36. Many of his grievances were denied on procedural grounds. For example, on one occasion, Ombudsman Tapp requested that plaintiff provide additional information. Id. at ¶ 37, Ex. 2. On December 12, 2014, after obtaining the information, plaintiff promptly refiled the grievance; however, it was denied by Ombudsman Whitehead as being filed outside the filing period. Id. at ¶ 43, Ex. 2.

On January 6, 2015, plaintiff filed a grievance regarding his inability to schedule an appointment with the medical department. Id. at ¶ 61. It was returned on January 14, 2015, with a request for a receipt of plaintiff's informal complaint. Id. In response, plaintiff filed a separate informal complaint and grievance because plaintiff had not received a receipt for his original

informal complaint. Id. at ¶ 61, Ex. 14. Ombudsman Whitehead denied the second grievance as untimely. Id. Ex. 14.

Plaintiff filed two grievances on January 10, 2015, one for a delay in receiving medication and the other stating that his back injury was a result of Sergeant Walden's failure to give him his knee wraps. Id. at ¶ 58, Ex. 11. The grievance regarding Sergeant Walden was determined to be unfounded at each level of review. Id. Ex. 11. There is no information as to what happened with the grievance regarding the delay in receiving medication.

Plaintiff filed a grievance on June 12, 2015, because his missing items were mailed out. Id. at ¶¶ 93-94, Ex. 24. Ombudsman Whitehead denied the grievance as being untimely filed and the intake decision was upheld. Id. On October 31, 2015, plaintiff filed a grievance because the medical department refused to issue him a sleep mask. Id. at ¶ 105. The grievance was determined to be unfounded by Warden Parker because "sleep masks are not a medical necessity." Id. Ex. 28.

On September 16, 2016, plaintiff filed a grievance because the medical department refused to give him copies of his medical records. Id. Ex. 34. Ombudsman Tapp denied the grievance as providing insufficient information and plaintiff filed an untimely appeal of the intake decision. Id.

On October 4, 2016, plaintiff filed a grievance regarding his "pain relieving cream running out." Id. at ¶ 147. There is no information regarding what happened with this grievance.[6]

---

[6] This provides an example of the frivolity of plaintiff's complaints. As defendant Nurse Shaw explained in her affidavit, the pain relieving cream at issue was discontinued by the manufacturer supplying GRCC, but GRCC located another manufacturer and renewed the medication supply in less than a month. Summ. Judg. Mem. [Dkt. No. 56] Ex. 3 ("Shaw Aff.") ¶ 22. In the meantime, plaintiff was provided with at least four other pain relievers or muscle relaxants. Id.

On November 1, 2016, plaintiff filed a grievance regarding his desire for a medical mattress as ordered by a doctor. Id. Ex. 41. Warden Parker determined that this grievance was unfounded, as did the Level II review. Id.

On November 10, 2016, plaintiff filed a grievance because he was not told the amount he had to pay for the copies of his medical records. Id. Ex. 43. Ombudsman Tapp denied the grievance as providing insufficient information and plaintiff filed an untimely appeal of the intake decision. Id.

Plaintiff filed two grievances on December 2, 2016, because he was not allowed to have his window tinted and because Dr. Gore refused to order a sleep mask for plaintiff. Id. at ¶ 160, Ex. 48. Both grievances were returned by Ombudsman Phillips who requested more information. Id. at ¶¶ 172-73. Plaintiff refiled the grievances with the requested information the same day. Id. Both grievances were determined to be unfounded at every level of review. Id. Exs. 48, 51.

On December 22, 2016, plaintiff filed one grievance regarding not being timely seen by the medical department and another grievance alleging that he was improperly charged a medical co-payment. Id. Exs. 52, 54. Both grievances were determined to be unfounded at every level of review. Id.

On December 27, 2016, plaintiff filed a grievance stating he felt discriminated against because he was told cell windows were no longer being tinted. Id. Ex. 53. This grievance was determined to be unfounded at every level of review. Id.

Plaintiff filed a grievance on January 10, 2017, regarding his request to be housed at Deerfield because of his visual impairments; however, it was denied as an improper request for services by Ombudsman Tapp. Id. Ex. 47.

On February 6, 2017, plaintiff filed a grievance stating that Nurse Smith made a false statement in response to one of plaintiff's previous grievances. Id. Ex. 56. Ombudsman Tapp denied this as non-grievable and the intake decision was upheld. Id.

On March 13, 2017, plaintiff filed a grievance because he did not receive his medications for fourteen days. Id. Ex. 60. Ombudsman Phillips denied the grievance as being different from the issue raised in plaintiff's informal complaint and the intake decision was upheld. Id.

On April 16, 2017, plaintiff filed a grievance because he had been waiting over a year to be seen by a neurologist. Id. Ex. 65. Ombudsman Phillips denied the grievance as raising more than one issue and the intake decision was upheld. Id.

Plaintiff alleges that theses grievances made Wardens Pearson and Goode, and Ombudsmen Tapp, Whitehead, and Phillips aware of plaintiff's deficient medical care; therefore, they were deliberately indifferent by failing to require "GRCC and Armor employees to implement corrective measures." Id. at ¶ 219.

### 4. Failure to Properly Train Staff

Lastly, plaintiff alleges that defendants Pearson, Parker, Goode, Whitehead, Tapp, and Philips failed to train their staff regarding how to properly deal with medical issues. Id. at ¶ 214.

### B. Standard of Review

Federal Rule of Civil Procedure 12(b)(6) allows a court to dismiss those allegations which fail "to state a claim upon which relief can be granted." A court may also dismiss claims based upon dispositive issues of law. See Hishon v. King & Spalding, 467 U.S. 69, 73 (1984). In considering whether to grant a Rule 12(b)(6) motion the Court must presume that the alleged facts are true, and the complaint should be dismissed only when "it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." Id. In other

words, to survive a Rule 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," id.; however, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to meet this standard, id., and a plaintiff's "[f]actual allegations must be enough to raise a right to relief above the speculative level." Twombly, 550 U.S. at 55.

### C. Analysis

As an initial matter, plaintiff's claims for money damages against all the defendants in their official capacity will be dismissed for failure to state a claim upon which relief may be granted. Will v. Mich. Dep't of State Police, 491 U.S. 58, 71 (1989) ("We hold that neither a State nor its officials acting in their official capacities are 'persons' under § 1983.").

As to plaintiff's remaining claims against the Correctional Defendants, to state a cognizable Eighth Amendment claim for denial of medical care, a plaintiff "must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." Estelle v. Gamble, 429 U.S. 97, 106 (1976). Specifically, plaintiff must allege two distinct elements to state a claim upon which relief can be granted. First, he must allege a sufficiently serious medical need. Second, and more importantly here, he must allege deliberate indifference to that serious medical need. Under this second prong, an assertion of mere negligence or even malpractice is not sufficient to state an Eighth Amendment violation; instead, plaintiff must allege deliberate indifference "by either actual intent or reckless disregard." Gregory v. Prison Health Servs., 247 F. App'x 433, 434 (internal quotation marks omitted). To do so, the prisoner

must demonstrate that a defendant's actions were "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." Id. (internal quotation marks omitted). Significantly, a prisoner's disagreement with medical personnel over the course of his treatment does not make out a cause of action. Wright v. Collins, 766 F.2d 841, 849 (4th Cir. 1985). Here, plaintiff has failed to allege that the Correctional Defendants were deliberately indifferent to his medical needs.

### 1. Failure to Provide Plaintiff his Missing Items

Plaintiff argues that the Correctional Defendants each had personal knowledge of plaintiff's medical issues and they should have known that the missing items, the sleep mask and knee wrap, were medically necessary because he told them he would be injured without them, he had medical authorization for the items, and he was deemed to be orthopedically and visually impaired by the VDOC ADA Coordinator. At the same time, plaintiff alleges, and the exhibits attached to plaintiff's Amended Complaint confirm, the medical personnel did not agree that plaintiff had a medical need for these items.

Plaintiff alleges that the Correctional Defendants could not release his missing items without approval from the medical department. Because plaintiff has not alleged that any of the Correctional Defendants were his medical provider at the time in question, they could not have been deliberately indifferent to a known medical need in denying plaintiff access to either a sleep mask or knee wrap based on the inconsistent instructions from the medical department. See Miltier v. Beorn, 896 F.2d 848, 854 (4th Cir. 1990), overruled in part on other grounds, Farmer v. Brennan, 511 U.S. 825 (1994) ("No record evidence suggests why the wardens should not have been entitled to rely upon their health care providers' expertise."). In other words, despite plaintiff's conclusory allegations to the contrary, the factual allegations in the Amended

Complaint and the exhibits attached to plaintiff's complaints establish that it would not have

been obvious to the Correctional Defendants that denying plaintiff access to the missing items

posed a substantial risk to his health and safety. See Scinto v. Stansberry, 841 F.3d 219, 226 (4th

Cir. 2016), cert. denied sub nom. Phillip v. Scinto, 138 S. Ct. 447 (2017) ("In deliberate

indifference to medical needs cases, Farmer's subjective prong requires proof of the official's

actual subjective knowledge of both the inmate's serious medical condition and the excessive

risk posed by the official's action or inaction.") (internal quotation marks, alteration, and

citations omitted).

### 2. Creating and Following a Policy of Delaying Medical Treatment

Plaintiff has not alleged any facts suggesting that any of the Correctional Defendants

were responsible for, or even had any control over, scheduling plaintiff to be seen by the medical

department. In addition, plaintiff has not alleged that any of the Correctional Defendants

prohibited him from being seen by the medical department. Accordingly, plaintiff has not

alleged that the Correctional Defendants were deliberately indifferent to his medical needs by

delaying his access to medical treatment. Moreover, as established by the medical records

submitted by both plaintiff and the Medical Defendants, plaintiff was seen either by GRCC

medical personnel or by outside medical specialists close to 100 times between October 27, 2014

and April 10, 2017. See Summ. Judg. Mem. 16.

### 3. Delaying the Processing of Grievances and Denial of Grievances

Inmates do not have a constitutionally protected right to a grievance procedure, and no

liability exists under § 1983 for a prison administrator's response to a grievance or appeal.

Adams v. Rice, 40 F.3d 72, 75 (4th Cir. 1994); Brown v. Va. Dep't Corr., No. 6:07-CV-00033,

2009 WL 87459, at *13. (W.D. Va. Jan. 9, 2009). Accordingly, none of the allegations in the

Amended Complaint support a claim that the Correctional Defendants were deliberately indifferent based on how they processed plaintiff's grievances.

Moreover, the inconsistent information regarding plaintiff's medical need for the missing items, which plaintiff acknowledges in his Amended Complaint, defeats his claim that the Correctional Defendants were deliberately indifferent to a known medical need. This record would also support granting the Correctional Defendants' request for qualified immunity, because a reasonable officer in the Correctional Defendants' position could have relied on the information indicating that plaintiff did not have a medical need for the missing items. Therefore, plaintiff has not adequately alleged that the Correctional Defendants were deliberately indifferent to his medical needs based on the way they processed his grievances, and they are also entitled to qualified immunity.

### 4. Failure to Properly Train Staff

Supervisory officials may only be held liable in certain circumstances for the constitutional injuries inflicted by their subordinates. Shaw v. Stroud, 13 F.3d 791, 798 (4th Cir. 1994) (citing Slakan v. Porter, 737 F.2d 368 (4th Cir. 1984)). This supervisory liability is not premised on respondeat superior, but upon "a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care." Id. (quoting Slakan, 737 F.2d at 372-73). "[L]iability ultimately is determined 'by pinpointing the persons in the decisionmaking chain whose deliberate indifference permitted the constitutional abuses to continue unchecked.'" Id. (quoting Slakan, 737 F.2d at 376). To properly allege supervisory liability under § 1983, a complaint must include facts showing:

> (1) that the supervisor had actual or constructive knowledge that his subordinate
> was engaged in conduct that posed "a pervasive and unreasonable risk" of

> constitutional injury to citizens like the plaintiff; (2) that the supervisor's response
> to that knowledge was so inadequate as to show "deliberate indifference to or tacit
> authorization of the alleged offensive practices,"; and (3) that there was an
> "affirmative causal link" between the supervisor's inaction and the particular
> constitutional injury suffered by the plaintiff.

Id. at 799 (citations omitted). Aside from his conclusory allegations, plaintiff has not alleged any

of the three elements of supervisory liability with any level of particularity as to the Correctional

Defendants. Therefore, plaintiff has failed to state a claim upon which relief can be granted as to

the Correctional Defendants and their Motion to Dismiss will be granted.

## II. Medical Defendants' Motion for Summary Judgment

### A. Standard of Review

Summary judgment shall be granted "if the movant shows that there is no genuine dispute

as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

56(a). The moving party bears the burden of proving that judgment on the pleadings is

appropriate. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (moving party bears the

burden of persuasion on all relevant issues). To meet that burden, the moving party must

demonstrate that no genuine issues of material fact are present for resolution. Id. at 322. Once a

moving party has met its burden to show that it is entitled to judgment as a matter of law, the

burden shifts to the non-moving party to point out the specific facts which create disputed factual

issues. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). In evaluating a motion for

summary judgment, a district court should consider the evidence in the light most favorable to

the non-moving party and draw all reasonable inferences from those facts in favor of that party.

United States v. Diebold, Inc., 369 U.S. 654, 655 (1962) (per curiam). Those facts which the

moving party bears the burden of proving are facts which are material. "[T]he substantive law

will identify which facts are material. Only disputes over facts which might affect the outcome

of the suit under the governing law will properly preclude the entry of summary judgment."

14

Anderson, 477 U.S. at 248. An issue of material fact is genuine when, "the evidence ... create[s a] fair doubt; wholly speculative assertions will not suffice." Ross v. Commc'ns Satellite Corp., 759 F.2d 355, 364 (4th Cir. 1985). Thus, summary judgment is appropriate only where no material facts are genuinely disputed and the evidence as a whole could not lead a rational fact finder to rule for the non-moving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

### B. Analysis

Plaintiff alleges that the Medical Defendants were deliberately indifferent to his medical needs by (1) failing to approve him for a sleep mask and/or a knee wrap as part of a policy of denying inmates medically approved property; (2) creating and following a policy of delaying medical treatment for inmates, in violation of VDOC operating policies; (3) maintaining a policy of cancelling, discontinuing, or refusing to properly order plaintiff's prescriptions; and (4) failing to properly train staff regarding the scheduling of medical appointments and the disbursement of medically approved property.

### 1. Sleep Mask

Plaintiff alleges that he suffers from a serious medical condition, photophobia, which makes him sensitive to light and for which he had been prescribed a sleep mask when he was incarcerated at Powhatan, and that the Medical Defendants' refusal to prescribe a sleep mask for him constitutes an intentional violation of his Eighth Amendment right to adequate medical care. In particular, he alleges that being deprived of a sleep mask has made it difficult for him to sleep. In various pleadings he also alleges to have suffered from headaches.

The defendants acknowledge that there is inconsistent evidence within plaintiff's extensive medical records as to the sleep mask, and that at various times different medical

personnel directed that plaintiff receive a sleep mask; however, as those records also show, none

of the medical staff who authorized a sleep mask had conducted an eye exam of plaintiff before

authorizing a sleep mask. All those records indicate is that plaintiff simply asked for the mask.

Defendant Gore, the director of the GRCC medical department, explains that he canceled

those orders because there was no evidence in the medical records supporting a finding of a

medical need for a sleep mask. The Court finds that the unrebutted evidence fully supports Dr.

Gore's conclusion.

When plaintiff was transferred to GRCC on October 27, 2014, the Intra-System Medical

Review included no mention of photophobia as a "current medical/dental problem." Summ.

Judg. Mem. Ex.1, at 1. Instead four conditions were listed: "Septoplosy for vestibular stenosis,"

"atypical CP [chest pain]/intermittent SOB," GERD (gastro-esophageal reflux disease), and left

shoulder pain. Id. The report indicated that plaintiff needed an MRI for the left shoulder pain

and that an echocardiogram and stress test were scheduled for October 29, 2014 at the Medical

College of Virginia. Id. The only medication related to plaintiff's eyes listed on a list of his

current medications was Visine A. Id.

The first reference to a sleep mask reflected in the medical records was on November 4,

2014, when plaintiff was seen by a Dr. Chan whose notes quote plaintiff as saying "I want my

sleep mask" and "I am light sensitive [and] cannot sleep." Id. Ex. 1, at 5. As the Medical

Defendants correctly point out, the doctor's conclusion that plaintiff could have his property was

not based on any diagnosis of a medical condition. The only evidence supporting Dr. Chan's

order was plaintiff's request.

Between November 4, 2015 and January 9, 2015, no medical report documents any

complaint by plaintiff of any eye problems. During that same time period plaintiff received his

echocardiogram and stress test at VCU on October 29, 2014. Id. Ex. 1, at 6-9. While at VCU, plaintiff provided his medical history, which is reflected in the PMH portion of the VCU records. See id. Ex. 1, at 13. There is no indication of any eye problems in the PMH. Id. Instead, what is reported is the following: "Nasal bone fracture 20[ years] ago, ENT surgery 6/2014[;] [C]hronic abdominal pain[;] GERD[;] h/o left [A]chilles tendon surgery 2009[;] Hypertensive episodes June 2013." Id. The VCU studies found no major cardiac problems; however, a follow-up EKG was recommended and one was performed on December 1, 2014. Id. Ex. 1, at 17.

On January 29, 2015, plaintiff was examined by Dr. Spruill, an optometrist, for a complaint of "eyes burn." Id. Ex. 1, at 23. This is the first evaluation of plaintiff by a medical practitioner specializing in eye care. Although plaintiff tries to suggest that Spruill never examined him, the medical report contradicts that claim. That report shows findings about plaintiff's vision, including which prescription would bring his vision to 20/20. Id. There is an indication of "dry eye" and a diagnosis of "hypertropia"[7] in plaintiff's right eye and "presbyopia"[8] in his left eye. Id. In the treatment section, Dr. Spruill wrote "Does not want to order glasses" and he prescribed artificial tears, a finding consistent with the indication that plaintiff had been getting Visine when he was at Powhatan. Id. There is nothing in that report suggesting that plaintiff suffers from photophobia.[9]

A medical record for April 10, 2015 shows plaintiff asking for a sleep mask, and the request being approved, but again, there is no indication of any medical exam having been

---

[7] "Hypertropia" involves a "permanent upward deviation of the visual axis of an eye." Hypertropia, Dorland's Illustrated Medical Dictionary (26th ed. 1981) 636.
[8] "Presbyopia" is "impairment of vision due to advancing years or to old age." Presbyopia, Dorland's Illustrated Medical Dictionary (26th ed. 1981) 1065.
[9] To the extent plaintiff disagrees with Dr. Spruill's evaluation, that does not establish that Dr. Spruill or any other Medical Defendant was deliberately indifferent by refusing to prescribe a sleep mask. Wright, 766 F.2d at 849 ("Disagreements between an inmate and a physician over the inmate's proper medical care do not state a § 1983 claim unless exceptional circumstances are alleged.").

conducted of his eyes by the person authorizing the sleep mask. Id. Ex. 1, at 43-44. In fact, most of the notes for that appointment discuss plaintiff's back pain. Id. Dr. Spruill's second, and last, report, dated December 1, 2016 indicates that plaintiff wants a sleep mask. Id. Ex. 1, at 138. There is no indication in that report that Spruill actually examined plaintiff; instead, all there is is his conclusion of "no medical evidence of need for sleep mask." Id.

The only other medical record of an eye examination of plaintiff is from August 4, 2017, when plaintiff was seen by Dr. Gupta, an opthamologist, for complaints of "photophobia," "glaucoma suspect," "QDM," "trauma," and "seasonal allergy." Id. Ex. 1, at 155. The record reflects that plaintiff received a full eye exam. Dr. Gupta's diagnosis, consistent with Dr. Spruill's earlier exam, was "dry eye syndrome." Id. He also found "[n]o evidence of other ocular pathology causing photophobia." Id. For treatment, Dr. Gupta recommended allergy drops as needed and found "[n]o medical necessity for window tinting," which plaintiff appears to also want. Id.

As the medical record of plaintiff's treatment clearly shows, although there were several health care practitioners who authorized plaintiff getting a sleep mask, none of those practitioners specialized in eye care and none had conducted an examination of plaintiff's eyes or made any medical diagnosis of a medical condition for which a sleep mask was needed. Moreover, the only two doctors specializing in eye care who had examined plaintiff's eyes agreed with the diagnosis of dry eye. Neither found evidence of photophobia and each concluded that all plaintiff needed to address his eyes was medicine for dry eyes.

Other than his unsupported belief that he suffers from photophobia, plaintiff has offered no evidence establishing that he suffered from a serious medical condition and no evidence that a

sleep mask was medically necessary. On this record, summary judgment will be granted to the Medical Defendants as to the sleep mask issue.

### 2. Knee Wraps

Plaintiff's claim as to needing his knee wraps is similarly unsupported by the record. Once again, there is no evidence in the transfer papers from Powhatan that plaintiff suffered from knee problems or needed knee wraps. Id. Ex. 1, at 1. Although there are some entries in the medical records authorizing plaintiff to get knee wraps, other than plaintiff requesting knee wraps, there is not a single diagnosis of any knee problem for which the wraps would be needed. The only reference to knee issues is the plaintiff's self-serving statement that the fall he encountered on December 26, 2014 resulted from his knee buckling. See Am. Compl. ¶ 48. The medical records preceding December 26, 2014 do not reflect any complaints by plaintiff about having weak knees or any pain in his knees. There is a record that on September 14, 2015, plaintiff was seen by medical staff for complaints of left shoulder, right knee, and hip pain, but these problems were described as "[n]ew onset" starting a few weeks ago. Summ. Judg. Mem. Ex. 1, at 78. In that same exam, plaintiff asked for his medications to be renewed, including artificial tears and trixacin cream, but he did not raise any issues about knee wraps. Id.

A review of plaintiff's medical records fully supports Dr. Gore's refusal to authorize knee wraps based on his conclusion that they were not necessary to address a medical condition from which plaintiff suffered.

### 3. Other Medical Issues

Plaintiff claims that the medical defendants and to some degree the correctional officers violated the Eighth Amendment by delaying his receipt of prescribed medications; however, the

unrebutted evidence does not support a finding of deliberate indifference to plaintiff's medical needs.

As explained by defendant Shaw in her affidavit, many of plaintiff's medications were issued as "KOP," or "keep on person," meaning plaintiff was able to keep the medications in his cell and take them as ordered. Shaw Aff. ¶ 14. Especially for prescriptions issued KOP, inmates are responsible for requesting refills with enough time for the prescription to be approved and ordered by the pharmacy. Id. To do so, an inmate must request a visit with a medical provider and then see the medical provider to have the prescription renewed with the GRCC pharmacy. Id. The pharmacy does not keep all medications in stock, and it can take the pharmacy three to seven days to obtain non-emergency medications. Id. The medications are then distributed to the different buildings in GRCC to be picked up by the inmates at the pill window during specified time periods. Id. Nurses cannot order medication for patients. Id. at ¶ 25. The record shows that plaintiff often did not request prescription refills with enough time for the refill to arrive before he ran out of his medications. Id. at ¶¶ 15-21, 24.

As defendant Gore explained in his declaration, the medical department has no control over the pharmacy's ability to keep medications in stock at all times. Id. Ex. 2 ("Gore Decl.") ¶ 46. Plaintiff does not provide any evidence contradicting this description of how prescriptions are handled, and that evidence clearly establishes that the Medical and Correctional Defendants' handling of plaintiff's prescriptions did not violate the Eighth Amendment.

At various points in his 240-paragraph Amended Complaint, plaintiff also alleges a failure to address defendants' failure to prescribe a soy-free diet and wedge pillow to relieve his GERD symptoms, as well as a medical mattress or mattress pad to relieve his back pain. The medical records do not show that such accommodations were medically necessary. The record

20

also shows that plaintiff's GERD was being addressed with medications such as Prilosec, and his back issues were being treated with physical therapy and Mobic, the medicine prescribed by the orthopedic clinic.

Moreover, the affidavits of Dr. Gore ("Gore Decl."), Shaw ("Shaw Aff."), and Smith (Summ. Judg. Mem. Ex. 4) fully explain what they did and why they took such actions. The statements in these affidavits are consistent with the medical records and chronology of plaintiff's complaints and treatment, and plaintiff has not produced any evidence, other than his opinion, that contradicts their affidavits. Lastly, even if defendants were wrong in their assessment that plaintiff did not need any of the items he requested—a sleep mask, knee wraps, wedge pillow, thicker mattress, soy-free diet, and tinted cell windows—the significant efforts they made to address plaintiff's many documented medical problems defeats his claims that they were indifferent to his serious medical needs.

Accordingly, for all these reasons, the Medical Defendants' Motion for Summary Judgment will be granted.

### III. Pending Motions

#### A. Discovery and Plaintiff's Motion to Deny or Defer Defendant's Motion for Summary Judgment

Plaintiff has filed a First Request for Production of Documents, which will be taken as a Motion for Discovery. Dkt. No. 69. Plaintiff's discovery motion will be denied as the information requested would not have helped plaintiff in opposing the Medical Defendants' Motion for Summary Judgment and several of the requests are burdensome and overbroad. Plaintiff's requests include, but are not limited to, information regarding each defendant's position (including duties, pay, incentives, bonuses, and performance standards), "all Informal Complaints, Grievances, or other documents received from GRCC prisoners by any of the

defendants . . . alleging they were not receiving adequate or timely medical care . . . from October 27, 2014, to the current date," "[a]ll documents detailing any communication between any of the defendants . . . regarding the prisoner's inability to receive adequate, proper, or tim[ely] medical care . . . from October 27, 2014, to the current date," and the contract between VDOC and Armor Health Care. Id. Plaintiff was provided a complete copy of his medical records while at GRCC as part of the Motion for Summary Judgment. Information about each defendant's position, the contract for health services, and information regarding other prisoners at GRCC, as requested, would be irrelevant to the claims plaintiff asserts as they would not establish how any defendant was deliberately indifferent to plaintiff's specific medical needs.

In addition, plaintiff was notified several times that he could, and should, reply to the Motion for Summary Judgment by filing counter-affidavits (sworn statements subject to the penalty of perjury), or other responsive material contesting the affidavits or records filed by defendants; however, he did not provide such materials. Plaintiff has submitted several affidavits of other inmates, none of which are actually relevant to the issues in this civil action. Therefore, plaintiff's Motion for Discovery will be denied and defendants' Motions to Stay Discovery will be denied as moot.

### B. Motion to Defer or Deny Defendant's Motion for Summary Judgment

Plaintiff has filed a Motion to Defer or Deny Defendant's [sic] Motion for Summary Judgment in which he argues that the motion for summary judgment should be deferred or denied because plaintiff should be allowed to proceed with discovery. Dkt. No. 70. For the reasons stated above, plaintiff has not established that the discovery he seeks would help him respond to the motion for summary judgment. Accordingly, plaintiff's Motion to Defer or Deny Defendant's [sic] Motion for Summary Judgment will be denied.

### C. Motion for Appointment of Counsel

Plaintiff has filed a Motion for Appointment of Counsel. Dkt. No. 71. A court may request an attorney to represent an indigent plaintiff proceeding in forma pauperis, 28 U.S.C. § 1915(e)(1); however, the Fourth Circuit has limited the appointment of counsel to cases where "exceptional circumstances" exist, such as cases with particularly complex factual and legal issues or with a litigant who is unable to represent himself adequately. Whisenant v. Yuam, 739 F.2d 160, 163 (4th Cir. 1984), abrogated on other grounds, Mallard v. U.S. Dist. Court for the S. Dist. of Iowa, 490 U.S. 296 (1989). It is unnecessary to appoint counsel for plaintiff as he has failed to demonstrate the existence of "exceptional circumstances" that would warrant appointment of counsel. In addition, plaintiff has ably represented himself in this matter, filing his Complaint, Amended Complaint, and several motions which contain various citations to legal authority. Accordingly, plaintiff's Motion for Appointment of Counsel will be denied.

### IV. Conclusion

For the foregoing reasons, plaintiff has failed to state a claim upon which relief can be granted pursuant to § 1983 as to the Correctional Defendants, and their Motion to Dismiss will be granted. In addition, the undisputed record establishes that the Medical Defendants were not deliberately indifferent to plaintiff's medical needs and their Motion for Summary Judgment will be granted. Finally, all remaining motions will be denied as moot. An appropriate order shall issue.

Entered this _30th_ day of _March_ 2018.

Alexandria, Virginia

_/s/_

Leonie M. Brinkema
United States District Judge